First case on our call this morning is Agenda No. 8, Case Numbers 105-741 and 105-745, Consolidated, Lebron v. Gottlieb Memorial Hospital. Counsel may proceed. Chief Justice Fitzgerald, and may it please the Court, my name is Theodore Olson. I represent Defendant Appellant Dr. Levy D. Ancona. Appellants have divided our time ten minutes, ten minutes, ten minutes. I will do the first ten minutes. Mr. Feinerman will then follow me and Solicitor General Scodro. Counsel, you're clear that we will not keep that time for you. Pardon me? We will not keep that time for you. I understand that, Your Honor. We'll do our very best to manage our time properly. First of all, I want to thank the Court for according me the privilege of appearing here today before this Court. I'm not a member of the Bar of the State of Illinois, as you know. I do feel close to the state. I was born in Chicago. I have many close relationships here, and it's a privilege to be here. This case is about what the Illinois Legislature, after lengthy hearings and study, found to be a health care crisis, which endangers the public's safety, welfare, and health care for the citizens of this state. Specifically, the Legislature found increasing financial burdens on physicians and hospitals, a reduction in the availability of medical care, and a disincentive to medical students from choosing Illinois as a place to practice medicine. A bipartisan majority of the Legislature, accordingly enacted, precisely tailored reforms to address and correct the crisis. Those reforms included increased oversight of physicians, modest limits on the recovery of non-economic damages, restriction and increased oversight of insurers, and non-meritorious malpractice actions. The limits on non-economic damages were comparable to those which have been enacted and upheld in many cases in 29 states. The Legislature expressly found, quote, in order to preserve the public health, the current medical malpractice situation requires reforms that limit non-economic damages in healing art malpractice actions. The standard of review, in this a facial challenge to the constitutionality of these reforms, is high. In the first place, because it's a facial challenge, the plaintiffs must prove that there are no set of circumstances under which the act may be valid. Statutes, of course, in this state are entitled to great deference and a heavy presumption of constitutionality. Review is de novo. A rational basis review is whether what is attempted to be accomplished by the Legislature is rationally related to a legitimate state interest. Certainly the health care for citizens of this state is a rational state and important legitimate state interest. If a court can conceive of circumstances that justify the legislative judgment, it must defer to that legislative judgment. Legislative factual findings and policy judgments are entitled to great deference. In order to be set aside, the court must find that they are manifestly wrong. To use the words of this court, could not reasonably be construed to be true. The issue for the court is not the wisdom of the enactment or policy judgments of the Legislature. As long as it is even debatable that the crisis exists or that the measures adopted will address the crisis, the Legislature's judgment has to be accepted as true. These are the words of this court. Here, the Legislature, after extensive hearings, testimony from all segments of the community, doctors, lawyers for persons injured by malpractice, insurance companies, scholars, and others, found that a significant crisis exists. A crisis that the Legislature has addressed before and a crisis that this court has repeatedly acknowledged does exist. And that placing limits on the most subjective types of damages, the types of damages that are most potentially subject to abuse, was not only appropriate and effective to address the problem but required, to use the words of the Legislature, means of solving the problem. These conclusions, unless manifestly wrong, must be accepted by this court. That is an important separation of powers consideration. The Legislature, as this court has held frequently, does have the power to alter the common law and to use the words of this court, change or limit available remedies. What the Legislature did in this court is impose modest restrictions on the availability of those types of remedies, damages for non-economic harm that are most subject to abuse. What's the difference between the remediatory and what the Legislature has done? Well, I think that a remediatory, properly conceived, going back as far as Blackstone, is a case-by-case analysis that judges undertake with respect to a particular case and whether a jury's judgment with respect to the amount of damages is excessive in a particular case. Other courts that have considered the issue about remediatory have concluded, and I submit this is the correct conclusion, that a generalized limit on the availability of damages is not a remediatory, it's not a case-by-case analysis, it is not the Legislature substituting its judgment for a judgment of a judge in a particular case. It is a substantive limitation on the available remedy. Counsel, if we were to agree with you, would we have to overturn Vest? No, I don't think so. I think Vest is distinguishable on a number of grounds. One of the things that the Court said in Vest is that what is inappropriate with respect to the separation of powers is an undue intrusion on the prerogatives of the judiciary. And in determining what would be an undue intrusion, the Court would consider the scope and nature of what the Legislature did. In the Vest case, it was a very broad application of a limitation to all types of actions that sought personal injury or property damages. The record is fairly clear that the Legislature looked at the right decision, which preceded the Vest decision, and the Vest decision itself, studied what the Court had said, looked at the language of the Court that said, yes, it can, with the Legislature, under appropriate circumstances, limit available remedies under the common law, focused on the crisis that did exist, limited the remedy to this specific problem, packaged that remedy that the Legislature had developed with other reforms specifically focused on malpractice. So I don't think that it would be necessary for the Court to overturn Vest. Vest, after all, one could argue was judicial dicta in the sense that the Court, in writing that opinion, had already decided that the statute there was unconstitutional special legislation. The Court then went on with an alternative finding with respect to legislative reminiture. Therefore, the Court can examine that case, look at what the Court specifically said that the Legislature can indeed do these things. This Court has upheld restrictions on joint and several liability in medical malpractice cases. It has upheld statutes of limitations and statutes of repose. It has upheld legislative restrictions, elimination of punitive damages. This is the type of thing that the Court has upheld in terms of the overall establishment of standards, not for particular cases, but for a category of cases where a problem exists. If this case becomes the first chip in Vest that covered all types, what would stop the Legislature from moving into another area, so eventually all of Vest would be overturned? Well, I think in each of those cases, what this Court would do would be to look at the scope and nature of what was being done, the severity of the problem, the justification for it. Indeed, if the Court were to adhere to the Vest decision, the Court would be very conscious of what the Legislature was doing. There, the Court had found that the solution to the problem was much greater than the nature of the problem. The justification didn't exist. We submit, and this Court has recognized that the justification here is clear. The remedy is narrowly focused. It's within the scope of what this Court has approved before, but I do submit that what a general standard with respect to limitation on damages is not a remediator, and that to the extent that the Court were to find that Vest is controlling, that the Legislature can't set limits on recovery of types of damages, there's a number of decisions of this Court that would have to be set aside, because you would then be saying that the Legislature can't look at a severe problem that is hurting the people of this state and their entitlement to medical care and solve the problem with respect to what 29 other states have already done. Which cases do you rely on that would have to be set aside? Which cases? Pardon me? Which cases would you have? Well, the Bernier case where the Court upheld the elimination of punitive damages, the cases that restricted non-economic damages and alienation of affections, and breach of promise cases, Smith and Siegel. I would submit the cases where there were statutes of limitations and statutes of repose, because that is addressing the nature of the remedy. Now, I want to be sure that I reserve time for my colleagues, and my ten minutes has been consumed. It goes very fast. With the Court's permission, I'll turn this over. Thank you very much. Thank you. Mr. Feinerman. May it please the Court, Counsel, I'm Gary Feinerman from Sidley, Austin, here on behalf of Defendants Appellant's Gottlieb Memorial Hospital and Nurse Florence Martinos. The plaintiff's position here is that the 1970 Constitution prohibits all damage caps, all liability limits on compensatory damages in all common law cases, regardless of the circumstances and regardless of the rationale. So what they're saying is, to pick up on one of the questions, that any damage cap, any liability limit is a legislative remitter and therefore prohibited by the Separation of Powers Clause, and also that any cap or limit is inherently irrational and therefore per se invalid under the Special Legislation Clause. That was not the holding of best and right, and what I'd like to talk about is that it could not have been the holding of best and right because that conclusion cannot be reconciled with the text or history of the 1970 Constitution. It's a cardinal principle of constitutional adjudication. The Court addressed this in Caballos recently and several other cases, that if the law is X prior to 1970 and the framers did not clearly indicate in the text of the Constitution, the committee reports, or the debate that they intended to change the law, then the law remains X after 1970. And that principle is directly pertinent here because prior to 1970, the General Assembly had enacted compensatory damage caps and liability limitations in common law cases. The Innkeeper Protection Act, the Breach of Promise Act, the Alienation of Affections Act, and as Mr. Olson mentioned in Siegel versus Solomon in 1960, the Court upheld the Alienation of Affections Act. That acts limits on non-economic damages against the Separation of Powers Challenge and the Special Legislation Challenge. And the plaintiffs in that case argued, and I'll quote, the legislature has invaded the province of the judiciary by formulating rules measuring the amount of damages recoverable. It's almost exactly what the plaintiffs are arguing here. The Court in 1960 rejected that argument and the framers in 1970 did not indicate any intent to alter that understanding of the Separation of Powers or the Special Legislation Clause. And the framers had examples from other state constitutions where other states had incorporated into their constitutions constitutional prohibitions on statutory damage caps or liability limits. The framers did not adopt any of those provisions, and to the contrary, they made clear that they intended to retain the pre-1970 understanding of the Separation of Powers. And that can mean only one thing, that the 1970 Constitution does not categorically prohibit all damage caps and liability limits. And that has to mean that all damage caps and liability limits are not legislative remitters. What is required is a more contextual inquiry into the provision, and UNSCR's an illustration of that, as is Bernier v. Burris. In UNSCR, the General Assembly, UNSCR considered Section 1117 of the Code of Civil Procedure, which modified the common law rule of joint and several liability, and it affected the way that statute affected the way in which jury verdicts for compensatory damages in common law cases were effectuated under the common law. But, Mr. Feiderman, that was apportioning liability just among defendants. It didn't really address the constitutionality of capping. It did in a way. It operated along a different axis. It didn't put a numerical limit on a particular defendant's liability. But it was among the defendants. Right, it was among defendants. But the key point here is that UNSCR shows that the General Assembly is not prohibited from changing how the common law gives effect to compensatory damage awards under the common law. And I want to emphasize under the common law, because that's really central to the plaintiff's argument here. What the plaintiffs are saying is that the General Assembly, if there's a statutory cause of action, can do whatever it wants. It can limit damages, and that's fine. But once it comes to the common law, jury awards for compensatory damages under the common law are sacrosanct. It can't be changed. But Section 1117 changed how the common law effectuates jury awards. Just like the provision upheld in Vernier v. Burris that upheld the modification of the collateral source rule in medical malpractice cases for hospitals and doctors, that also affected how the common law effectuated jury verdicts. And then we go to the Innkeeper Protection Act, which, of course, predated the 1970 Constitution. The Innkeeper Protection Act, if effectuated, which it has been, does impact how jury verdicts are effectuated in common law causes of action. And that's really what makes this case similar to UNSCR. I agree with you. The limit operates along a different axis, but it's still the same underlying principle that the case illustrates. Is it your argument that the legislature could constitutionally eliminate non-economic damages in cases such as these? That's what Siegel holds. Siegel approved, under both the Separation of Powers Clause and the Special Legislation Clause, a statute that eliminated non-economic damages. And here's the irony. And, of course, the General Assembly did not do that here. There's a million-dollar limit for hospitals, $500,000 for physicians. And if there are non-cap defendants in the case, those defendants don't have any limits whatsoever. But in Siegel, the court held that the General Assembly can eliminate non-economic damages with respect to particular causes of action, where the circumstances require. And with the Alienation of Affections Act, the General Assembly found that the act had been subject to abuses and it had to step in to correct those abuses in a limited way by focusing on those subjective non-economic damages. So the plaintiffs are left in a very difficult and, I think, insurmountable position. If Siegel is right, and it was, and regardless of what we think of Siegel, the framers in 1970 did not alter, did not express disagreement with Siegel. So what the plaintiffs have to argue is that while the General Assembly can eliminate non-economic damages altogether, that it has that authority, what the General Assembly can't do is they don't have the lesser power of retaining non-economic damages and imposing limits on it. And that's just an untenable position. So what we have is a situation where there are some limits and caps that are valid, and we know that from Unsecker. We know that from Bernier. We know that from Siegel and from the existence of the Innkeeper Protection Act. Some caps and limits are invalid. We know that from Betts. And the question then becomes, the hard question becomes, how do you distinguish between valid caps from invalid caps? And what our brief did, and I don't have the time to go through all of it, is to try and distill from this Court's precedents, both in the cap context and just in the general separation of powers context, three considerations that recur throughout this Court's jurisprudence that can help us distinguish valid from invalid provisions under the separation of powers clause. And I just want to reiterate one thing that Mr. Olson said. This Public Act 94677 was not a tort reform statute. Unlike the Civil Justice Reform Act of 1995, it was not a tort reform statute.  There was a problem. Doctors were leaving the state. There were no neurosurgeons treating brain injuries south of I-80. That's a big problem. OB-GYNs were stopping practicing. Hospitals stopped providing certain services. The cause of that was skyrocketing medical malpractice. Insurance premiums in the General Assembly heard. These conclusions about the flight of physicians, is that something we must accept? Yes. I believe under the Court's precedents, if the General Assembly makes factual findings that are reasonable and supported by the evidence, as long as reasonable minds can disagree, and in this instance they certainly could, I believe those legislative findings are binding on the Court. And finally, Mr. Olson alluded to the fact that people could argue that the separation of powers holding in Best was dicta. Do we have to, if we follow your line of reasoning in the cases you've argued, do we have to overrule Best with regard to separation of powers, or are you arguing that that was dicta and it's not binding on us? I don't think you have to hold either. I think Best is entirely consistent with our conception of the separation of powers. And when we lay out the three considerations that recur throughout this Court's separation of powers jurisprudence, Best is part and parcel of that analysis, and Best is reconcilable with Unsecker and Siegel and Bernier. So there's no need to overrule Best. And what distinguishes Best from this case is that Best was a real massive legislative encroachment on judicial terrain. Here the General Assembly was looking to remedy a health care crisis. Some of the witnesses said it's the doctor's fault. Other witnesses in the General Assembly said it's the insurance company's fault. And the doctors came in and said it's the plaintiff's lawyer's fault. And the General Assembly said, you know what, you're all a little bit right. We're going to have greater insurance regulation to make sure that there's more competition. We're going to have greater regulation of physicians to make sure to reduce bad medical outcomes, which in turn cause medical malpractice premiums to rise. And we're going to fix those components of the medical malpractice system, litigation system, that cause the most problem for insurers. And in each instance they focused on the root of the problem. Isn't that just another name for what the effect is? Oh, no. Oh, no, it's not. It was a health care problem, and the General Assembly attacked it from all sides. And what the separation of powers is about is about the legislature moving too far into judicial terrain. And here it's just undeniable that the General Assembly was focusing on a health care problem, and they attacked it on both sides. I don't think the insurers were very happy about the provisions, about the amendments to the insurance code that require them to share proprietary data and subject them to rate regulation. I'm sure that the doctors were not happy with the amendments to the Medical Practice Act that creates that website and doubles the number of investigators and increases the statute of limitations. And, true, the plaintiff's bar was not happy with what happened. It was kind of like a good settlement. Everybody walked away a little bit unhappy. But it just proves the point that this was health care legislation. Mr. Feinemann, there are statements in the brief on this little bit unhappy thing that would suggest that that state of mind would not apply to the people who had suffered from the malpractice injury. Yes, that's part of it. That's not a little bit that they're asked to provide to this map. Right, and what the General Assembly did here was to look at the greater good. And patients as a whole, the state as a whole, benefits from this legislation as a whole because by solving the medical malpractice insurance problem, doctors will start practicing again. We're going to get neurosurgeons. We've gotten neurosurgeons south of I-80. OBGYNs can start practicing again. And when there's an enhancement in the medical services available to the people of the state of Illinois, it benefits everybody. And, true, there are some, every component of the legislation, everybody got nicked in this legislation, but it was for the greater good. And that's really central to the separation of powers analysis because it shows that the General Assembly was not simply interested in tinkering with how the judiciary handles med mal cases, but it was interested in solving a health care problem, which is one of its core functions. I think I've gone over my time. Unless there are further questions, I'll turn the microphone over to Mr. Skodra. Thank you, Mr. Feinerman. Good morning, and may it please the Court. Michael Skodra from the Illinois Attorney General's Office here on behalf of the intervener appellant, the state of Illinois. And I'd like to begin essentially where Mr. Feinerman left off in emphasizing the fact, as the briefs already point out to some extent, that for purposes of the constitutional analysis, it's essential to understand that the act at issue here is a comprehensive, holistic health care access bill. It is not a litigation reform bill, as was true in some of the acts that have been struck down historically. And it's true, Your Honor, everyone has been asked to give something, including, of course, those who have suffered injury. The same was true in Grand Trunk and Mushan and the cases upheld under the Workers' Compensation Act, in which undoubtedly workers who suffered injuries far in excess of the caps imposed or the limitations imposed by that legislation certainly bore part of the public policy response, a part of the burden of the public policy response to that, again, holistic legislative response to a public problem. The legislature in this case received credible evidence of a health care access crisis in Illinois statewide, though naturally it had specific impacts in particular regions and specialties. And they understood, they had credible evidence that there were three potential causes of this. There were different theories. Some pointed fingers at each other, as Mr. Feinerman pointed out, but some blamed doctors, and not just doctors generally, but frequently the testimony focused on repeat offender physicians, physicians that continuously engaged in negligent misconduct. That was one theory. Another was that the insurance industry, the med mal insurance industry, required drastic new regulatory reform. And the third was that the unpredictability of non-economic damage awards was putting tremendous pressure on the medical malpractice premiums. They heard evidence of all three non-mutually exclusive explanations for what was causing this crisis in the state of Illinois. They reasonably and rationally responded to all three. And Justice Freeman responds to your earlier question, absolutely there is a need for deference to these findings. Aaron Gold speaks not only of deference to factual findings, but even rational speculation by the General Assembly. Now in this case we have far more than that. We have direct fact finding, and indeed as recently as this Court's decision in Empress Casino earlier this term, the Court has made clear that this deference is critical to its constitutional analysis. In the face of these three explanations, they came down hard on all three. With regard to insurance, it cannot be overstated the extent to which, the dramatic nature by which insurance regulation was improved in the state of Illinois. There is dramatic new authority over rate setting, whereas in the past regulators had to choose between rejecting outright a proposed rate increase. Now they may fine tune proposed rate increases by medical malpractice insurers, and they may do so in a public forum, which is the ISMI hearing that we cite and quote from in our brief explains, and is available online, hundreds of pages of testimony by witnesses who came forward to express views, and a careful and minute dissection of the calculus underlying the rate setting process that ISMI used for that proposed rate increase. The increase was improved in that case, but by virtue of this act, the insurance regulators were able to put all sorts of other conditions on ISMI, including dividend payouts and other efforts to reduce risk among physicians. There's also far more public transparency here, and that is of course essential, as we pointed out in our brief, to additional competition. It's my understanding that competition is increasing as more and more statistical information, and proprietary data that had been understandably held close to the vest historically, was being made public, and this was being used as our brief explains to allow for far greater competition in the Illinois insurance market. I understand that my time has expired. Unless the court has any questions, I'd be happy to. Thank you. Counsel, you may proceed. May it please the court, I'm Michael Gottesman. I'm representing the Plaintiff Appellees here. I, too, appreciate the courts allowing an out-of-stater to appear. I did spend four years here at the University of Chicago. I loved them dearly. We would like, time permitting, to talk both about separation of powers and about special legislation, which would be an alternative ground for affirming here. Our central point about separation of powers is that BEST squarely and categorically stands for the proposition that this way of solving a problem, that is, putting a cap on compensatory damages in a common law action, is not permissible. And I would quote the key paragraph of BEST, the paragraph that captures that holding, and I'm quoting, the cap is mandatory and operates wholly apart from the specific circumstances of a particular plaintiff's non-economic injuries. Therefore, it unduly encroaches upon the fundamental judicial prerogative of determining whether a jury's assessment of damages is excessive. Now, Mr. Olson suggests the case stands only for the proposition that those caps that happen to unduly encroach are forbidden, and if you could find a cap that doesn't unduly encroach, it wouldn't be covered by BEST. But the passage I just quoted tells us what unduly encroaches means. If it operates wholly apart from the specific circumstances of a particular plaintiff's non-economic injuries, therefore, it unduly encroaches. So it is a categorical holding, and the dissenting justice in BEST understood it to be a categorical holding. That justice said, and I'm quoting, the majority's broad holding on this question means, in essence, that the legislature may never impose a limit on damages, at least in common law actions. Now, Mr. Olson also quoted another passage from BEST in which the court said that the outcome was dependent on the nature and the scope of the particular change in the law. But that passage did not come in the discussion of separation of powers. That passage was a part of the court's discussion of special legislation. And, of course, when the question is whether legislation is special rather than general, of course one needs to focus on the nature and the scope of the statute, and it's entirely understandable that that passage was in that part of the opinion. The key is there is no such passage in the part of the opinion that dealt with separation of powers, because the court's holding there was categorical. Now, the argument has been made by the defendants that this statute is not really quarreling with the correctness of the jury's determination of damages. The legislature is not second-guessing the jury. It's simply declaring as a matter of law that damages are not recoverable, that what it's really saying is as a matter of law, even though you did suffer these damages, you shall not receive them. Well, that argument was made in BEST. It was made by the Attorney General in BEST. And in our brief at page 34, we quote the passages from the Attorney General's brief in BEST where they made that precise argument. That argument was also embraced by the dissent in BEST, which said we should not regard this as an undue encroachment on the judiciary. The legislature isn't invading the remit of their power. The legislature is simply declaring as a matter of law that some damages aren't recoverable. And though the Attorney General argued that and the dissenting judge argued that, the court's opinion in BEST expressly rejected that in the passage that I read. The argument has also been made by the defendants that it should make a difference here, that this statute was not simply targeting the recoveries that plaintiffs received, but it is multidimensional, that it also, of course, as it does, regulates insurance and regulates physicians. But that's irrelevant to the separation of powers consideration. The fact that this statute contains regulation of insurance doesn't mean the legislature is entitled to come and unduly encroach upon the judiciary's domain. There are ways, of course, to address problems, but the legislature seizing the judiciary's role, the role that the judiciary in the BEST case declared belongs to the judiciary and cannot be encroached upon, is not changed simply because the statute has some other provisions that don't involve the judiciary at all. The argument has been made here today that the BEST decision has somehow been eroded by this court's subsequent decision in UNSCR. But far from it, the court in UNSCR expressly repeated, without suggestion that it disagreed with, the holding in BEST. It said, in BEST, we held that the cap invaded the judiciary's prerogative of determining whether a jury's assessment of damages is excessive within the meaning of the law. It was quoting to the very passage that I began my discussion with here today. But then the court in UNSCR went on and said, but here what we're doing is not imposing a cap that reduces the verdict. It is, as Justice Burke indicated in questioning earlier, simply saying that a defendant can be limited to its share of the fault, and the court expressly said what made this different from BEST is that the statute does not reduce the amount of the jury's verdict. Now, it's the legislative reduction of the amount of the jury's verdict which was the vice that BEST said violated separation of powers. And what UNSCR said is, this is different, this is not reducing the jury's verdict. Finally, the Siegel case has been invoked for the proposition that this court, prior to 1970, had already said that the legislature could put caps on damages and that, therefore, some instances of that must be allowable. And implicitly, I think that the categorical statement in BEST must be wrong. But if one looks at the Siegel case, what you will find is that what the court said there is that the legislation dealing with alien of affection actions is not affecting the recovery of actual damages. It is only affecting the recovery of punitive or aggravated damages. And, therefore, it is not an imposition on the judiciary's role with respect to actual damages. Now, the argument is made in the briefs, ah, but among the things that the court said were affected were recoveries for humiliation and shame. And surely those are actual damages, even though this court, apparently misunderstanding that, said they were not actual damages. But back then, one did not recover for emotional injury in the absence of a physical injury. That's what the common law was. And that's why, at that time, the court would have understood that the recovery of shame and humiliation, which was ordinarily not recoverable by someone who had not recovered a physical injury, that's why the court would not have understood that to be an imposition on the normal compensatory damages available in a common law action. So there really is nothing, either before BEST or after BEST, that casts the slightest doubt on the central holding of BEST, the holding that the legislature cannot dictate and compel this court to reduce a verdict which is not excessive in a common law cause of action. Now, we have also argued that this statute violates special legislation. And the other side has suggested, or at least one of the briefs on the other side has suggested, that the court shouldn't reach that, that if it were to rule against us on the separation of powers, it ought to remand the case. But there's no reason to do that here. The questions that are posed under special legislation are questions of the law. Nothing would be gained by remanding. There is an importance, obviously, in the state in getting a resolution of the status of this statute, because if, as we contend, this aspect of the statute is invalid, then the legislature would have interest in finding a solution that would pass constitutional muster, and that opportunity should not be delayed for a period of years by remanding on this. And in talking about special legislation here, I want to assume something which we've argued vigorously against in our brief. We have suggested that the evidence before the legislature clearly demonstrated that it was not rising malpractice awards that were driving the increase in insurance premiums, that indeed the data that had been supplied by ISME itself, the largest insurer, the insurer of more than 50% of the policies in this state, showed that while its premiums had been rising dramatically, its payouts, both in lawsuits and in settlements, had remained flat, so that what was driving that increase were things quite totally unrelated to malpractice awards. But for the moment, let's assume that the legislature could have reasonably concluded otherwise, and that therefore it would not be sufficient simply to impose the insurance reforms and the additional regulation of physicians that this statute proposed. Nonetheless, the way the legislature went about, and let me back up and say one more thing, what the Attorney General has suggested, that in that circumstance, it was necessary to get a contribution from health care consumers. That is, that what was needed here was not only some sacrifice by the insurers, not only some sacrifice by physicians in terms of greater regulation, but also some sacrifice by the health care community. Was this question of medical exodus raised in the trial court and was evidence produced? Well, the case was decided on motions as a matter of law. So certainly much of this evidence was argued in the briefs and in the appendices as reasons why you should conclude that in fact the legislature didn't rationally conclude that the recoveries and malpractice awards were a part of the problem. That was presented. But the points that I want to make assume for the moment that the court would say, as it has said in prior cases, you may be right, but the legislature might reasonably have concluded otherwise, and we're not here to second-guess them. Even on that assumption, what the legislature did here was a violation of special legislation, and a violation in terms that were clearly shown to be violations in four prior decisions of this case, best, right, grace, and grass, all of which found violations under the special legislation clause in circumstances like this. There are several reasons for this, and the first and the most obvious is one of the reasons that was given in both the best decision and the right decision. Both of those cases said that it violates special legislation to distinguish between the slightly injured and the seriously injured and to impose the entire burden, the entire sacrifice, if you will, on the most seriously injured people. And, of course, that's what this statute does. It says that someone who is modestly injured by an act of medical malpractice will recover 100 percent of their injuries, both economic and non-economic. But a person who is grievously injured, as was the plaintiff infant in this case, who suffered at birth and will suffer for a lifetime, severe brain injury, cerebral palsy, cognitive mental impairment, the inability to feed normally such that she has to be fed through a tube for her entire life, and inability to develop normal neurological function. Now, here is a child whose non-economic damage recovery would likely, assuming liability is found, would likely exceed and perhaps exceed substantially the caps that are contained in this statute. This child will make an enormous contribution to the solution of the problem, assuming that some contribution is needed. But those who are injured modestly will make no contribution. And, of course, those patients who were not injured at all, but who could have been, after all, we're talking about insurance premiums and the need to put controls on insurance premiums. Well, at the point at which the insurance is being paid, everybody is potentially the victim for whom the insurance proceeds would be needed. And even though the attorney general says the healthcare consumers ought to contribute to this solution, the only people being asked to contribute to this solution are the most seriously injured people, almost by definition the people least capable of making this contribution. So under that holding of best and right, this is clearly a case. It is exactly the case that both best and right said constituted a violation of special legislation. You can't get that contribution by imposing it solely on the most seriously injured people. This statute violates special legislation in other ways that are somewhat different from those two cases as well. It favors high wage earners as opposed to other citizens. Imagine two people who are victims of medical malpractice. One of them is a very high earner and suffers relatively little pain and suffering, but has suffered an enormous loss of wages, let's say $3 million. This statute does not cap the $3 million. That victim will recover $3 million. The other victim is someone like our plaintiff in this case, whose pain and suffering would, let's assume, justify an award and would garner an award from a jury of $3 million. She will recover only a fraction of her recovery. Even though the jury's determination and appropriate determination is that each of them suffered the same amount, one of them is going to recover fully and the other is not. And it is, in that sense, discrimination between high wage earners and others. Now, Wright, the decision in Wright, gave yet another basis on which statutes like this are special legislation. In Wright, which like this case was a cap only in med mal cases and no others, this court held categorically that to cap only med mal and not to cap any other tort was special legislation. Now, of course, the special legislation clause in the Constitution says that special legislation is invalid if there could be a general law that would solve the same problem. So our position here is not that even if it were true that the insurance reforms and the physician reforms alone wouldn't solve this problem, and even if it were true that some contribution from healthcare consumers was needed, our position is not, well, sorry, you can't have that. Illinois will just have to suffer all the horrible consequences that would flow from that. And, again, I'm assuming for the moment that some contribution beyond the insurance reforms was necessary, because there are a myriad of ways in which the legislature could have distributed this additional contribution that was required. So that it didn't focus solely on the most seriously injured people. Mr. Godeson, I'd like to go back. Maybe I didn't fully understand your argument with regard to the high-wage earner, low-wage earner. Isn't that true in every case where the plaintiffs are attempting to recover for loss of wages, no matter whether this statute was in effect or not? Well, surely, yes, of course, a high-wage earner will recover more than a low-wage earner. But both of them will recover 100% of what their damages were. What makes this statute different is that the high-wage earner is going to recover the 100% of his or her damages, but the low-wage earner who suffered pain and suffering is not going to recover 100%. That's the distinction. It's not that low-wage earners ought to get the same wages as high-wage earners. It's that people who are similarly situated in that they each suffered a $3 million injury are going to be treated differently because one of them's injury was a loss of wages and the other's was a tragic set of non-economic circumstances that would justify an award of equal size. Now, just to suggest some of the ways that this additional contribution could have been made from health care consumers, and again, what the Attorney General's brief says is some sacrifice was needed from health care consumers because all of them are going to benefit from the provisions of this statute. Well, if that's right, then all of them should be contributing. That could be accomplished in several different ways. One, the legislature could do what it did in workers' compensation. It could say, well, we are going to withdraw the medical malpractice common law action and replace it with a no-fault compensation scheme. That's one way. A second way would be to say that premiums above a certain level would be paid from general revenues. That would distribute the cost to everybody. It would be all health care consumers. Another way, which at least Maryland has done, I don't know if other states have done this, Maryland has a rule that when you go to one of those categories of doctors who have been most affected, OBGYNs, neurosurgeons, each office visit there is an 8 cents. That's all it is, an 8 cent tax on the visit. The doctor collects 8 cents from each patient. That 8 cents is put into a fund. That fund provides the compensation for the overage. So our position is not that even if a contribution is needed, the law doesn't allow you to have one. Our position is that if a contribution is needed, then it ought to be shared by all who are getting the benefit of this, just as the Attorney General argues should be the case, that if all are going to benefit, all should sacrifice. And there are ways to do it. But our very last point about special legislation is that no sacrifice from the health care consumers should be required, unless the legislature first decides that the problem can't be solved by correcting the wrongdoing. There's no doubt that there were two aspects of wrongdoing that were driving malpractice insurance premiums. One is, as is now dramatically clear, and indeed was clear at the time the legislature was considering this, ISME, which virtually monopolized the insurance industry in this state, had raised its rates dramatically even though there were no payoffs. And in fact, we are told by the briefs of the other side that three years later, this statute has been a remarkable success. Well, why has it been a remarkable success? It has nothing to do with the caps on malpractice, because everybody said at the time of the legislation, we won't begin to see the effect of the caps on malpractice awards for at least three years, because it's only going to apply to injuries that occur after the statute occurs. It's occurred because the insurance premiums have dropped, because ISME was required to disclose what its experience had been. The reason that other insurers were unwilling to come into Illinois and compete with ISME is because ISME, Illinois was virtually alone in not requiring insurance companies to disclose what their experience was by category of physician, etc. In the absence of that information, insurers were unwilling to come into Illinois because they didn't know how to price their premiums. What do you charge as a premium to an OBGYN? We need to know what the experience is with that category. The evidence was being withheld. Once ISME was required to disclose that data, huge numbers of additional insurance companies came in. We got exactly what you'd expect. We got competition in premium rates. Was that information, counsel, before the legislature? What the legislature had was the gross numbers. That is, the legislature knew that ISME's payouts for both malpractice awards and for settlements had remained flat. We describe all of that in our brief. That information was before the legislature. So they had two pictures. They had the picture of flat malpractice rates, malpractice awards, and the picture of escalating malpractice premiums. And that's why we say that they really didn't have a justification for going beyond the insurance reforms and logically the physician reforms as well. What was not before the legislature, because ISME had never disclosed it, was, well, okay, your payouts were flat, but we need to know what they were by category of physician, because what competing insurers were saying is, we need to know how to price the premium for various categories of doctors, and unless we can get the information on particular categories of doctors, we don't know what to charge. And as soon as ISME was required to give that data, so we had the gross data that there was no increase, but we didn't have the test-specific data by category of physician. Are we bound by what was presented to the legislature? When you say are you bound by it, yes. I mean, is that the only thing we can consider? Right, right. Well, yes, we agree. Properly consider? Yes. That is, it seems to us that you are bound to know two things. Number one, that, in fact, the total amount of payouts had not increased over the five years preceding the enactment of the statute, both lawsuits and settlements. There was not an increase in payouts by insurers for the malpractice. So that was, we think, really undisputed. There were a lot of people. When I say undisputed, the empirical evidence was undisputed. There were people getting up and saying, oh, the sky is falling, malpractice awards are rising, but there was no evidence to support that. And the legislature also knew that while that figure was flat, the premiums were rising dramatically. The legislature also knew that ISME virtually monopolized the market in Illinois and that others weren't competing, and they were told that the reason others weren't competing is that other insurance companies didn't have the data that they needed, which was the more specific data by category of physicians so that they would know how to price the premiums. Are you in a position to reasonably question the conclusions the legislature made based upon the facts that we give into that? Well, we have argued in the last part of our brief that as a matter of equal protection, this statute is irrational. And it is irrational because of the things I've just been talking about now. But you certainly don't need to decide that in order to decide that we're right on the separation of powers and on special legislation. Because remember, the special legislation arguments that I've made were even assuming a contribution was required from patients. It's inappropriate to put the entire burden of that contribution on the most seriously injured people, because as the attorney general says, everyone benefited, you know, every health care consumer is getting the benefit of this statute, and therefore, the health care consumer class ought to contribute. Well, even if you believe there was this need and that the health care consumer class should contribute, we say it's a violation of special legislation to put the entire contribution on the shoulders of the people who suffered the most. And that, after all, is what best and right health. So I've said my piece. I'm, of course, available if the court has any questions. Thank you. Thank you, counsel. And it may proceed with rebuttal. I will attempt to limit my portion of the rebuttal to seven and a half minutes and allow seven and a half minutes for Mr. Flanerman. I understand it's our responsibility to do that. It's very important to put this in focus. What the plaintiffs are saying, and it's quite clear, that the BEST case stands for, squarely and unequivocally, it prohibits all legislative limits on the recovery of common law damages. All caps unduly encroach. Therefore, the legislature may not do it. That is essentially saying that the legislature of Illinois cannot do what every other state in the United States can and does do in connection with not just medical malpractice cases but other types of cases, and the Congress of the United States does. It establishes standards. This court has said that the legislature can change the remedies and availability of recoveries under the common law. Mr. Gottesman says that the legislature cannot do that. But this court has already upheld restrictions on punitive damages, non-economic damages. That Siegel case talked not just in terms of damages for humiliation but damages to reputation, which are non-economic damages. The legislature of this state has changed joint and several liability. It's established legislation, as one of the other briefs talk about it, in the innkeeper liabilities area, goods American laws. All of those kinds of things are changes by the legislature pursuant to the need to address specific problems so that the choice is either best does not stand for that absolute prohibition. It stands for undue encroachments. The only way to determine what is an undue encroachment is to look at the nature of the alleged encroachment and the scope of the alleged encroachment and determine whether it is undue or not. I submit that this court cannot adopt or should not adopt the categorical definition of the absolute limit on legislative authority that the plaintiffs are proposing in this case because the people have got to go to their legislature. The legislature is equipped. This court is not equipped to hold hearings, to hear testimony, to decide what the policies of this state shall be with respect to recovery of damages under the common law. Now, the alternative is to either construe the best decision as limited to the circumstances there where it was a blunderbuss approach to all kinds of personal injury tort cases or to determine that, in fact, this is not a remediator. A standard with respect to recovery of damages is not a remediator, and a case-by-case judgment in individual cases, whether a jury has gone beyond the bounds permitted to it, is a remediator, but that's not what the legislature did. Now, what did the legislature do? It reserved all economic damages. It imposed very high limits on the recovery of non-economic damages, those types of damages which are very subjective and subject to abuse. What affects the policy rates of insurance companies is the predictability and the understanding of what kind of risk is out there. The legislature made these judgments. Counsel, can we consider at all the statement in the briefs that the recoveries remain flat for a five-year period, or is that just all part of a mix before the legislature? The legislature, yeah, I think the court may consider those statements, but what the court must do, what the court has said it must do, is give great deference to the legislature who heard all of that evidence, who evaluated all that evidence, and made a policy judgment with respect to a balance. This court put it well, I think. Can we consider it all on the special legislation question? I think you can consider it. As was pointed out, the difference between plaintiffs. Well, with respect to the issue of the difference between the plaintiffs, any cap on liability or any cap on damages is going to affect persons who allegedly incurred the most damage. But what the legislature did is what this court very carefully described in the Mega v. Holy Cross case a few years ago. If the legislature concluded, and it did, that there was a serious crisis in the availability of doctors, hospitals, and medical care in this state, who does that affect the worst? People who are in the least favorable economic segment of our society are the ones that would have the most trouble having access to doctors, medical care, specialists, and that sort of thing. So some judgment has to be made if there is a problem. The legislature said there was a problem, found there was a problem, by doing its job by listening to all sides and taking the evidence, and determined what the solution should be. As this court put it in the Mega v. Holy Cross case, the reposed periods there and now reflect the legislature's balance of an individual's interest in recovery against the problems and costs perceived in medical malpractice actions and the public's interest in having available to it affordable medical care. All pieces of legislation are compromises. They're invariably compromises. But that's why we do have a separation of powers. That's why we have elected representatives that can spend a year considering these things, looking at the problem as a whole, not with respect to one particular case. Now it's important to emphasize that the compromise that the legislature made in this case is the same type of compromise that 29 other states have done. Many of those other states have lower caps on non-economic damage recovery than the state of Illinois did. The rest of them are either very identical to what Illinois did or slightly higher. But the point, I guess, with respect to that is not because you're going to decide that what the legislature in California or Texas or Nebraska did is what you have to do, but the reasonableness of the judgments of the legislature are not just measured by deference to the nature of the problem and the nature of the solution that the legislature crafted, which, if debatable, you have to defer to, I submit. But the fact that 29 other legislatures, at least, were looking at similar types of problems, coming up with similar types of conclusions, how irrational is that? That can't be that irrational if that many other states are doing it. With respect to that same point, including the legislative remunerative case, we cited the five cases where the courts have considered that and said that just is not consistent with what the separation of powers concepts are. I submit, and I want to let Mr. Feinerman have the balance of the time of our rebuttal, is that there was a serious problem here. This court has recognized in a number of its cases that there is that serious problem in the malpractice area. The legislature made compromises. There always will be compromises and there always will be people that would like things differently. But the greater good, that is to say that the preamble to the state constitution is the health, benefit, welfare of the people of the state overall. In order to provide medical services in a way which are affordable and available to the people, the legislature listened to all the evidence and said we've got to do a number of things, one of which is limits on non-economic damages in the same sense that other states have done it and have been successful doing it. Thank you. Thank you, Counselor. Mr. Feinerman. Thank you, Mr. Olson. Thank you. I'm going to try and leave a little bit of time for Mr. Scodro as well, and I know we have to keep that time. Plaintiff's counsel said that the entire burden fell on injured plaintiffs. That is not true in a number of respects. The burden of this health care statute fell on insurance companies. With the amendments to the insurance code fell on doctors and derivatively hospitals with respect to the Medical Practice Act. And it must be remembered that there are no limits on liability for economic damages. That includes lost wages, medical care, and the life care plan. And with an injury of this nature, those damages can go up into the eight figures. So we're not leaving injured plaintiffs without any redress. There's going to be significant redress with respect to these economic damages. How do you respond to Mr. Gottesman's argument that the insurance industry had to bear a burden, the medical providers had to, but as far as the health care users, it only falls on the most seriously injured, not to everyone that's getting the benefits? There's no constitutional principle that says that everybody in the state of Illinois has to bear a burden in order for a statute to be constitutional. In Bernier v. Burris, all of the burden fell on medical malpractice plaintiffs, and that was declared constitutional. What the burden sharing shows, and the burdens are spread very widely across all stakeholders, is that the General Assembly was not focused on trying to tinker with what happens in the judiciary, what happens in medical malpractice litigation. What it shows is that the General Assembly was sincerely focused on a health care problem, and it attacked that problem from all sides, requiring sacrifice from a wide variety of stakeholders, and that's key to the separation of powers analysis. In Best, there was no discernible relation between the means that the General Assembly chose and the end of fixing what was wrong in the tort system. Here, the General Assembly focused like a laser beam on precisely the problem. It didn't affect any of the other professions, focused on doctors. It didn't affect any of the other insurers, focused on medical malpractice insurers. It didn't focus on economic damages. It didn't focus on any other tort cases, solely focused on medical malpractice cases, and solely focused on the one element of medical malpractice cases, the non-economic damages that were so unpredictable, they were causing these dislocations in the medical malpractice insurance market. The legislature did its job here. And I'm going to say one more thing and then turn it over to Ms. But, Mr. Scheinerman, could you answer Justice Carmeier's question about the more severely injured versus the least injured with regard to that? Are they treated differently? They're all subject to the same cap, and yes, by definition, a cap caps damages. A liability limits liability, and that will affect those who have suffered the most harm. What Mr. Gottesman is saying, the logical conclusion of what Mr. Gottesman is saying is that because caps affect and limits affect the most severely injured plaintiffs, caps and limits are per se unconstitutional. That's what he's asking you. He's very candid. That's what he's asking you to hold, and that cannot be. So that argument proves too much. It's not that caps cap damages or that liability limits limit liability. It's why. What's the reason the General Assembly chose to do so? And here the General Assembly had a very good reason. There was a health care crisis. There were no neurosurgeons treating brain injuries south of I-80. Doctors were leaving the state. The General Assembly chose a multifaceted, comprehensive solution to that problem. I'll turn it over to Mr. Scodro. Thank you. Thank you, and I'll be very brief. The plaintiffs have made the point that the Attorney General has argued that there should be a wide distribution of benefits. The point there is I think the one that Mr. Feynman just made. It is evidence of the fact that this was an exercise of the appropriate police power on the part of the General Assembly. And just to conclude a point that Mr. Feynman was also making, the idea that there are certain individuals who will suffer or who will end up, I suppose, bearing a greater burden here is true in, as he said, in Bernier. Those who would have been entitled to punitive damages would have been true in Unzicker. Those were the only solvents. Tortfeasor was liable for only 24 percent of the liability in that case. It would have been true in Anderson where the four-year statute of repose in medical malpractice cases was upheld for the individual who first discovered their injury four years and one day after that occurred. And it's certainly true in the workers' compensation context where there were no caps, but whole categories of common law liability was eliminated, pain and suffering and so on. That, of course, in exchange for a benefit for workers broadly to ensure access to payments, but certainly those who would have been entitled to those common law remedies, in a sense, that workers who were injured but would not have been entitled to those causes of action did not. Thank you. Thank you, counsel. Thanks to all counsel who gave us splendid arguments this morning. We appreciate it. Case numbers 105-741 and 105-745.